**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| BRIGADE LEVERAGED CAPITAL STRUCTURES FUND LTD., *et al.*, <br><br> **Plaintiffs,** <br><br>         **v.** <br><br> ALEJANDRO GARCIA-PADILLA, *et als.*, <br><br> **Defendants.** | **Civil No.** 16-1610 (FAB) |
| NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION, <br><br> **Plaintiff,** <br><br>         **v.** <br><br> ALEJANDRO GARCIA-PADILLA, *et al.*, <br><br> **Defendants.** | **Civil No.** 16-2101 (FAB) |
| DIONISIO TRIGO-GONZALEZ, *et al.*, <br><br> **Plaintiffs,** <br><br>         **v.** <br><br> ALEJANDRO GARCIA-PADILLA, *et al.*, <br><br> **Defendants.** | **Civil No.** 16-2257 (FAB) |
| U.S. BANK TRUST NATIONAL ASSOCIATION, <br><br> **Plaintiff,** <br><br>         **v.** <br><br> THE COMMONWEALTH OF PUERTO RICO, *et al.*, <br><br> **Defendants.** | **Civil No.** 16-2510 (FAB) |

## OPINION AND ORDER

BESOSA, District Judge.

Before the Court are the parties' arguments as to whether there is sufficient "cause" to grant plaintiffs relief from the automatic stay imposed by section 405(b) of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), Pub. L. No. 114-187, 130 Stat. 549 (2016).  For the reasons discussed below, the Court holds that there is not and therefore **MAINTAINS** the stay.

Also before the Court is the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board" or the "Board")'s motion to intervene in these consolidated cases.  (Civil No. 16-1610, Docket No. 137; Civil No. 16-2101, Docket No. 89; Civil No. 16-2257, Docket No. 65; Civil No. 2510, Docket No. 72.) Having considered the content of the Board's motion, the Court **DENIES** the motion **WITHOUT PREJUDICE.**

## I.   BACKGROUND

### A.   The Moratorium Act and Ensuing Executive Orders

On April 6, 2016, the Commonwealth of Puerto Rico enacted the Puerto Rico Emergency Moratorium and Financial Rehabilitation Act ("Moratorium Act") to address its grave fiscal crisis, which has been brought to a "perilous tipping point."  Moratorium Act, Stmt. Of Motives, § A.  The Moratorium Act aims to give the Puerto Rico Government the "tools" it needs "to continue providing essential services to the people" of Puerto Rico in light of the Government's

lack of "sufficient resources to comply with debt service obligations as originally scheduled." Id.  To that end, the Moratorium Act empowers the Governor to issue executive orders (1) declaring a "state of emergency" with respect to the Commonwealth or its instrumentalities, and (2) suspending payment of principal and interest on "covered obligations," during a "covered period" through January 31, 2017.[1]  Moratorium Act, §§ 103(m), 201(a).  It also authorizes the Governor to "expropriat[e] property or rights in property interests" and to suspend or modify any statutory or other obligation to transfer money for the payment of, or to secure, any covered obligation, so that instrumentalities subject to the Moratorium Act are able to pay for "essential services." Id. §§ 201(b), (d)(ii).

Pursuant to the authority vested in him by these provisions of the Moratorium Act, the Governor has issued a series of executive orders (collectively, the "Executive Orders").  Of particular relevance in these four consolidated actions are:  (1) Executive Order 10, which declared a state of emergency with respect to the Government Development Bank of Puerto Rico ("GDB"), imposed limits on transfers to GDB creditors, and suspended payment of any obligations guaranteed by GDB; (2) Executive Order 14, which declared a moratorium on the payment of GDB covered obligations; (3) Executive Order 18, which declared a state of emergency with

_____

[1] The Moratorium Act expires by its own terms at the end of the "covered period."

respect to the Puerto Rico Highways and Transportation Authority ("PRHTA") and suspended PRHTA's obligation to transfer toll revenues pledged to PRHTA bondholders; (4) Executive Order 30, which extended the emergency period with respect to PRHTA, suspended PRHTA's obligation to make certain debt payments, and suspended the Commonwealth's obligation to make payments on bonds or notes issued or guaranteed by the Commonwealth, other than payments to GDB; and (5) Executive Order 31, which continued the suspension of PRHTA's obligation to transfer pledged toll revenues, declared a state of emergency with respect to the University of Puerto Rico ("UPR") and the Puerto Rico Public Finance Corporation ("PRPFC"), and suspended UPR's obligations to transfer pledged revenues to UPR bondholders.

**B.   Plaintiffs' Claims in the Underlying Litigation**

  **1.   Civil No. 16-1610**

    Plaintiffs in Civil No. 16-1610 (the "Brigade plaintiffs") allege that they are investors who collectively hold more than $750 million worth of outstanding bonds issued by the GDB. (Civil No. 16-1610, Docket No. 52 at p. 4.)  They challenge certain provisions of the Moratorium Act "that retroactively and unconstitutionally strip them" of certain "contractual and property rights embodied in their existing GDB bonds."  They seek a declaration that sections 105, 201(b), 201(c), 203(b)(i), 203(f), 301, 302, and 401 of the Moratorium Act should be declared null and void because they:  (1) violate the Contract and Takings Clauses of

the United States and Puerto Rico Constitutions, (2) violate the Commerce Clause of the United States Constitution, (3) are preempted by both the Bankruptcy Clause of the United States Constitution and section 903(1) of the Bankruptcy Code, 11 U.S.C. § 903(1), and (4) violate the United States Constitution by staying federal court proceedings. Id. at p. 31-32. The Brigade plaintiffs also seek an injunction prohibiting the Commonwealth defendants from enforcing any of these challenged provisions.

**2.   Civil No. 16-2101**

In Civil No. 16-2101, plaintiff National Public Finance Guarantee Corporation ("National") alleges that it provides insurance for approximately $3.84 billion of debt issued by both PRHTA and the Puerto Rico Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financial Authority ("AFICA"). (Civil No. 16-2101, Docket No. 1 at p. 1.) National asserts that its insurance "enabled the Commonwealth and many of its instrumentalities to borrow funds on more favorable terms than they otherwise could have." (Civil No. 16-2101, Docket No. 1 at p. 1.) It further asserts that, in exchange for providing this insurance, it obtained "various property and contractual rights relating to the debt," and that the Moratorium Act has effectively "taken these property interests and substantially impaired these contractual rights." Id. at p. 15-16.

National argues that the Moratorium Act is preempted by federal law and that it violates the United States Constitution "in

a number of independent ways." Id. at p. 2.  It therefore seeks a declaration that:  (1) Sections 201(a), (b), (d), and (e) of the Moratorium Act are preempted by both the Bankruptcy Clause of the United States Constitution and section 903(1) of the Bankruptcy Code, 11 U.S.C. § 903(1), (2) sections 201 and 202 of the Moratorium Act violate both the Takings and Contracts Clauses of the United States Constitution, and (3) section 201(b) of the Moratorium Act violates the Supremacy Clause of the United States Constitution by purporting to bar access to the federal courts. Id. at p. 31.  It also seeks an injunction prohibiting the Commonwealth defendants from taking any action pursuant to those challenged provisions of the Moratorium Act.  Id.

### 3.    Civil No. 16-2257

Plaintiffs in Civil No. 16-2257 (the "Trigo plaintiffs") allege that they are a group of predominantly Puerto Rican individuals and corporations who together hold more than $100 million worth of GDB and PRPFC bonds.  (Civil No. 16-2257, Docket No. 1 at p. 4.)  They assert that the Moratorium Act "creates a framework and scaffolding for the systematic stripping of assets" of the GDB and the PRPFC "that will render each unable to meet its obligations to bondholders." Id. at p. 5-6.  The Trigo plaintiffs therefore seek a declaration that sections 105, 201, 203, 301, 302 and 401 of the Moratorium Act are null and void because they: (1) violate the Takings and Contracts Clauses of the United States and Puerto Rico Constitutions, (2) are preempted by both the

Bankruptcy Clause of the United States Constitution and section 903(1) of the Bankruptcy Code, 11 U.S.C. § 903(1), and (3) violate the United States Constitution by staying federal court proceedings.  Id. at p. 14-15.  They also seek an injunction prohibiting the Commonwealth defendants from enforcing any of these challenged provisions.

### 4.    Civil No. 16-2510

In Civil No. 16-2510, plaintiff U.S. Bank Trust National Association ("U.S. Bank") alleges that it is a national banking association and the trustee under a certain trust agreement authorizing and securing UPR bonds with an outstanding principal amount of $431,790,000.  (Civil 16-2510, Docket No. 1 at p. 1.)  It argues that Executive Order 31 allows UPR and the Commonwealth to "divert and expropriate pledged revenues," including approximately $89 million in tuition and fees, "to meet expenses other than debt service."  Id. at p. 1, 3.  According to U.S. Bank, this "threatens irreparable harm" both to its interest as trustee and to the bondholders by inviting the "permanent loss of collateral pledged to secure" the UPR bonds.  Id. at p. 3-4.  Plaintiff U.S. Bank also alleges that it is currently in possession of certain funds deposited in its UPR bond trust accounts, which it wishes to apply to the payment of those bonds.  Id. at p. 4.

U.S. Bank seeks a declaration that (1) section 201 of the Moratorium Act and Executive Order 31 violate the Takings Clauses of the United States and Puerto Rico Constitutions, (2) section 201

of the Moratorium Act and Executive Order 31 violate the Contracts
Clauses of the United States and Puerto Rico Constitutions,
(3) Executive Order 31 is preempted by PROMESA section 303(3), and
(4) section 201 of the Moratorium Act and Executive Order 31 are
preempted by PROMESA section 303(1).  (Civil 16-2510, Docket No. 1
at p. 34.)  It also seeks a preliminary injunction compelling UPR
to transfer pledged revenues of tuition fees and student fees, as
well as a permanent injunction prohibiting the Commonwealth
defendants from enforcing Executive Order 31 or any of the
challenged provisions of the Moratorium Act.  Id.

C.   **PROMESA and its Automatic Stay Provision**

On June 30, 2016, the President signed PROMESA into law.  The
legislation seeks to address the dire fiscal emergency in Puerto
Rico.  It is designed to establish "[a] comprehensive approach to
[Puerto Rico's] fiscal, management and structural problems and
adjustments . . . involving independent oversight and a Federal
statutory authority for the Government of Puerto Rico to
restructure debts in a fair and orderly process."  PROMESA,
§ 405(m)(4).  PROMESA establishes the seven-member Oversight Board
for Puerto Rico.  PROMESA §§ 101(b)(1), (e)(1)(A).  "The purpose of
the Oversight Board is to provide a method for [Puerto Rico] to
achieve fiscal responsibility and access to the capital markets."
Id. § 101(a).  The Oversight Board operates as an entity within the
Puerto Rico Government, id. § 101(c), and is given broad authority
over the Commonwealth and any of its instrumentalities that the

Board designates as "covered" instrumentalities. Id. § 101(d)(1). The Board is endowed with a variety of significant powers, including the authority to develop, review, and approve territorial and instrumentality fiscal plans and budgets, id. §§ 201-202; to enforce budget and fiscal plan compliance, id. §§ 203-204; to seek judicial enforcement of its authority to carry out its responsibilities under PROMESA, id. § 104(k); and to intervene in any litigation filed against the Commonwealth or its instrumentalities, id. § 212. All members of the Oversight Board were appointed on August 31, 2016.

Among PROMESA'S provisions is an automatic stay of all liability-related litigation against the Commonwealth of Puerto Rico, which was or could have been commenced before the law's enactment. PROMESA § 405(b). Congress deemed that component of the legislation "essential to stabilize the region for the purposes of resolving" Puerto Rico's financial crisis. Id. § 405(m)(5). The stay is designed to "allow the Government of Puerto Rico a limited period of time during which it can focus its resources on negotiating a voluntary resolution with its creditors instead of defending numerous, costly creditor lawsuits." Id. § 405(n)(2). It also helps "to ensure all creditors have a fair opportunity to consensually renegotiate terms of repayment" and allows the Oversight Board time "to determine whether to appear or intervene on behalf of the Government of Puerto Rico in any litigation." Id. § 405(m)(5)(B), (A). Congress indicated that, by serving these

important purposes, PROMESA's automatic stay was ultimately intended to "benefit the lives of 3.5 million American citizens living in Puerto Rico." Id. § 405(n)(5).

The automatic stay is "limited in nature," PROMESA § 405(m)(5)(B), and remains in effect until the earlier of (1) February 15, 2017, with a possible extension of sixty or seventy-five days, or (2) the date on which the Oversight Board files a petition on behalf of the Government of Puerto Rico or any of its instrumentalities to commence debt-adjustment proceedings pursuant to title III of PROMESA.[2] Id. § 405(d). The court may, however, grant relief from the stay to "a party in interest" either "for cause shown," or "to prevent irreparable damage" to the party's interest in property. Id. § 405(e)(2), (g).

## D.   Significant Procedural Developments

On August 22, 2016, the Court found that plaintiffs' claims in Civil No. 16-1610, Civil No. 16-2101, and Civil No. 16-2257 were brought "with respect to a Liability," and therefore fell "squarely within the scope of cases automatically stayed pursuant to section 405(b)(1) of PROMESA." (Civil No. 16-1610, Docket No. 99 at p. 11.)[3] Accordingly, the Court stayed those actions and held an evidentiary hearing on September 22 and 23, 2016 to determine

_____

[2] PROMESA's automatic stay expires by its own terms on the earlier of those dates.

[3] For the sake of convenience, the Court will only cite to the docket for Civil No. 16-1610 when referring to filings and orders that appear in the dockets for all four of these consolidated cases.

whether, pursuant to section 405(e) of PROMESA, relief from stay was warranted.[4]

Just prior to that hearing, on September 21, 2016, the United States Department of Justice filed a Statement of Interest on Behalf of the United States urging the Court to "narrowly construe" PROMESA's "for cause" provision and to "postpone granting any relief from the automatic stay until the Oversight Board . . . is fully operational and in a position to determine whether to intervene" in this litigation. (Civil No. 16-1610, Docket No. 116 at p. 2.)

On October 7, 2016, before the parties submitted their post-hearing memoranda, the Oversight Board filed a motion seeking an extension of time to allow it to "retain staff and counsel, to review the record in these cases" and "to prepare its responses to the lift stay motions." (Civil No. 16-1610, Docket No. 126 at p. 3.) Citing its statutory right to intervene in any litigation filed against the Commonwealth or any "covered territorial instrumentality," PROMESA §§ 101(d)(1)(A), 212, as well as congressional intent that the automatic stay provide the Oversight

---

[4] Plaintiff U.S. Bank in Civil No. 16-2510 did not challenge the applicability of PROMESA's automatic stay to its case. Rather, its preliminary focus has been on seeking relief from the stay pursuant to Section 405(e) of PROMESA. See Civil No. 16-2510, Docket No. 2. Thus, on August 25, 2016, it filed a motion seeking to join the hearing scheduled for Civil No. 16-1610, Civil No. 16-2101, and Civil No. 16-2257. Id. Docket No. 19. The Commonwealth defendants consented to that request, and on September 1, 2016, the Court issued an order both granting U.S. Bank's request to join the hearing and staying its action pursuant to section 405(b)(1) of PROMESA. Id., Docket Nos. 23-24.

Civil Nos. 16-1610, 16-2101, 16-2257, 16-2510 (FAB)          12

Board time to determine whether to exercise that right, id.
§ 405(m)(5)(A), the Oversight Board maintained that there was "good
cause" to grant its request. (Civil No. 16-1610, Docket No. 126 at
p. 3.)  The parties were given an opportunity to respond to the
Oversight Board's motion, Civil No. 16-1610, Docket No. 128, and no
objection was made.  Thus, on October 13, 2016, the Court granted
the Oversight Board's request for additional time.  (Civil No. 16-
1610, Docket No. 133.)

On October 21, 2016, the Oversight Board moved the Court to
intervene in these four consolidated cases either as of right
pursuant to section 212 of PROMESA and Federal Rule of Civil
Procedure 24(a), or permissively pursuant to Federal Rule of Civil
Procedure 24(b).  (Civil No. 16-1610, Docket No. 137.)  The parties
were afforded an opportunity to respond to the Board's request for
intervention.  Id., Docket No. 133.

With a full cast of characters now before it, the Court turns
to address the essential issues at hand:  (1) whether the Oversight
Board is entitled to intervene in these consolidated actions, and
(2) whether plaintiffs in any of these four cases have shown
sufficient "cause" to vacate PROMESA's automatic stay in order to
allow their individual claims to proceed to litigation on the
merits.

## II.  DISCUSSION

### A.   The Oversight Board's Motion to Intervene

The Oversight Board asserts that it is entitled to intervene as of right in these consolidated actions pursuant to Federal Rule of Civil Procedure 24(a) and section 212 of PROMESA. Alternatively, it argues that the Court should grant it permissive leave to intervene pursuant to Federal Rule of Civil Procedure 24(b).

### 1.   Procedural Deficiency pursuant to Rule 24(c)

Although the Oversight Board's motion to intervene indicates its opposition to vacating the stay in these cases, it is not "accompanied by a pleading that sets out the claim or defense for which intervention is sought," as required by the federal rules of procedure.  Fed. R. Civ. P. 24(c).  Rather, the Board merely states that it is "not at this time taking any position on the merits of the parties' claims and defenses in the pending challenges to the Moratorium Act and related Executive Orders." (Civil No. 16-1610, Docket No. 137 at p. 10.)

The First Circuit Court of Appeals has indicated, however, that Rule 24(c)'s requirements are mandatory and that a party's failure to meet them warrants dismissal of its motion.  See Public Service Company of New Hampshire v. Patch, 136 F.3d 197, 205 n. 6 (1st Cir. 1998).  Given the procedural deficiency in the Oversight Board's motion to intervene, the Court is obligated to **DENY** that motion.

**B.   Plaintiffs' Motions to Vacate PROMESA'S Automatic Stay**

Plaintiffs in all four cases argue that the Court should vacate the automatic stay "for cause shown," pursuant to section 405(e) of PROMESA.  (Civil No. 16-1610, Docket No. 71; Civil No. 16-2101, Docket No. 36; Civil No. 16-2257, Docket No. 11; Civil No. 16-2510, Docket No. 2.)  Unlike plaintiffs in the other three cases - who seek relief from stay solely to litigate their constitutional claims - plaintiff U.S. Bank in Civil No. 16-2510 also seeks to vacate the stay in order to:   (1) impose a preliminary injunction forcing its borrower, UPR, to transfer pledged student tuition and fees to U.S. Bank's trust accounts, and (2) disburse funds currently held in a reserve account to UPR bondholders.  (Civil No. 16-2510, Docket No. 2 at p. 2.)

The Commonwealth defendants oppose these requests for relief and seek a continuation of PROMESA's automatic stay.  (Civil No. 16-1610, Docket No. 81; Civil No. 16-2101, Docket No. 74; Civil No. 2257, Docket No. 53; Civil No. 16-2510, Docket No. 33.)  GDB, PRPFC, and UPR filed additional post-hearing briefs in support of maintaining the stay.  (Civil No. 16-2257, Docket No. 54; Civil No. 16-2510, Docket No. 61.)

**1.   Vacating the Automatic Stay "For Cause":  Establishing the Governing Standard**

The automatic stay imposed by section 405(b) of PROMESA is not absolute in nature.  Although Congress unambiguously expressed its view that the stay is needed to "provide the Government of Puerto Rico with the resources and the tools it needs

to address an immediate existing and imminent crisis," PROMESA § 405(n)(1), it also seemed to anticipate that certain circumstances might justify relief from the stay's significant, rigid effects.  It therefore included a form of safety valve in section 405(e) of PROMESA to allow certain holders of "liability claims" against the Government of Puerto Rico to proceed with their actions, provided that they could effectively demonstrate "cause" for doing so.

The text of PROMESA, however, does not indicate what, exactly, a party in interest must do to establish "cause" for relief from the automatic stay successfully.  Rather, it leaves the task of defining the boundaries of that specific term to the discretion of the courts.  Thus, before it can proceed to review the arguments and evidence presented by the various parties, the Court must first attempt to hash out and clarify the meaning and parameters of the governing principle of "for cause shown."

### i.   Defining "Cause" for Relief from Stay

Section 405 of PROMESA was patterned on the automatic stay provision of the United States Bankruptcy Code, 11 U.S.C. § 362, ("section 362").  Indeed, the two provisions are, in some respects, nearly identical.  In light of these appreciable similarities, the Court will attempt to give meaning to the concept of "cause" by looking first to judicial interpretations of that term within the bankruptcy context.  It will then reflect upon certain additional considerations that ought to inform its

understanding of what constitutes proper "cause" to vacate the PROMESA stay.

### a.   Prevailing Interpretations of "Cause" within Bankruptcy Case Law

Similar to section 405 of PROMESA, section 362 of the United States Bankruptcy Code provides that courts may grant relief from the automatic stay to a party in interest "for cause." 11 U.S.C. § 362(d)(1).  Also like PROMESA, however, section 362 does not provide concrete guidance on how that term ought to be construed and applied in practice.

United States courts of appeals reviewing motions to vacate the Bankruptcy Code's automatic stay pursuant to section 362(d) have consistently found that the decision to grant that relief is largely discretionary with the court.  See, e.g., In re Myers, 491 F.3d 120, 130 (3d Cir. 2007) (commenting on the "wide latitude accorded to the Bankruptcy Court to balance the equities when granting relief from the automatic stay."); Brown v. Chestnut (In re Chestnut), 422 F.3d 298, 303-04 (5th Cir. 2005) (noting that 11 U.S.C. § 362 gives the bankruptcy court broad discretion to vacate the automatic stay and "flexibility to address specific exigencies on a case-by-case basis"); Claughton v. Mixson, 33 F.3d 4, 5 (4th Cir. 1994) (noting that Congress "has granted broad discretion to bankruptcy courts to lift the automatic stay" and that "the courts must determine when discretionary relief is appropriate on a case-by-case basis."); Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 814 F.2d 844, 847 (1st Cir. 1987)

Civil Nos. 16-1610, 16-2101, 16-2257, 16-2510 (FAB)          17

(applying abuse of discretion standard to court's decision granting relief from the automatic stay); Matter of Holtkamp, 669 F.2d 505, 507 (7th Cir. 1982) (emphasizing that section 362(d) "commits the decision of whether to lift the stay to the discretion of the bankruptcy judge.")

          To help guide their analysis of whether to enforce or vacate the stay, some courts, including those in this district, have relied upon a laundry list of assorted factors. See, e.g., Sonnax Industries, Inc. v. Tri Component Prods. Corp. (In re Sonnax Industries, Inc.), 907 F.2d 1280, 1286 (2d Cir. 1990) (enumerating 12 different factors to be utilized in determining whether there is "cause" to vacate a bankruptcy stay, including the "impact of the stay on the parties and the balance of harms"); see also C&A, S.E. v. P.R. Solid Waste Mgmt. Auth., 369 B.R. 87, 94-95 (D.P.R. 2007) (Casellas, J.) (considering factors similar to those spelled out in Sonnax).

          In the end, however, the process of evaluating whether there is sufficient "cause" to vacate the automatic stay in bankruptcy cases requires the court to engage in an equitable, case-by-case balancing of the various harms at stake.  See, e.g., Peerless Ins. Co. v. Rivera, 208 B.R. 313, 315 (D.R.I. 1997) (suggesting that cause generally exists "when the harm that would result from a continuation of the stay would outweigh any harm that might be suffered by the debtor . . . if the stay is lifted."); In re Robinson, 169 B.R. 356, 359 (E.D. Va. 1994) (noting that, "in

deciding whether 'cause' has been shown, the bankruptcy court must balance the potential hardship that will be incurred by the party seeking relief if the automatic stay is not lifted, against the potential prejudice to the debtor" if it is.); In re Turner, 161 B.R. 1, 3 (Bankr. D. Me. 1993) ("Cause may exist for lifting the stay whenever the stay harms the creditor and lifting the stay will not unduly harm the debtor."); In re Harris, 85 B.R. 858, 860 (Bankr. D. Colo. 1988) (holding that vacating the automatic stay is appropriate where "no great prejudice will result to the debtor" and "the hardship to the creditor resulting by continuing the stay considerably outweighs the hardship to the debtor by modification of the stay."); In re Opelika Mfg. Corp., 66 B.R. 444, 448 (Bankr. N.D. Ill. 1986) ("Cause to lift the stay exists when the stay harms the creditor and lifting the stay will not unjustly harm the debtor or other creditors.")

The Court finds that this general framework employed in the bankruptcy context is also applicable to these proceedings  pursuant to PROMESA.  Thus, in deciding whether the plaintiffs in these cases have established "cause" for relief from the PROMESA stay, the Court's ultimate task is to perform a careful balancing of the equities involved.  It must assess the hardships realistically borne by plaintiffs if their requested relief is denied and determine whether those outweigh the harm likely to be visited upon the Commonwealth defendants if that relief is granted.

  **b.**   **"Lack of Adequate Protection" as Sufficient "Cause"**

    Section 362 of the Bankruptcy Code includes one specific type of "cause" sufficient to grant a party in interest relief from stay: "the lack of adequate protection of an interest in property." 11 U.S.C. § 362(d)(1). This provision has allowed courts to vacate the stay in bankruptcy proceedings where a secured party, faced with a decrease in the value of its collateral while the stay is in effect, is not supplied by the debtor with an alternative form of relief that will safeguard its interest in that collateral. See In re Monroe Park, 17 B.R. 934, 937 (D. Del. 1982) ("[T]he concept of adequate protection requires a debtor to propose some form of relief that will preserve the secured creditor's interest in the collateral, pending the outcome of bankruptcy proceedings.")

    Section 405(e) of PROMESA, however, does not explicitly identify "lack of adequate protection" as a ground for obtaining relief from stay. At first blush, that omission would seem to suggest that Congress simply did not intend for inadequate protection to justify a secured creditor's circumvention of PROMESA's automatic stay. Indeed, the Commonwealth defendants make this exact argument and entreat the Court, in interpreting the statute, to view the absence of "lack of adequate protection" as a purposeful exclusion of significant consequence. See 9/22/16 Tr. at 58:18-59:4.

Civil Nos. 16-1610, 16-2101, 16-2257, 16-2510 (FAB)          20

          The Court, however, declines to oblige the Commonwealth on this request.  Rather, it finds that Congress was not required to have included "lack of adequate protection" in the statutory text in order for that particular, long-standing means of showing "cause" to be available to creditors in PROMESA lift-stay proceedings.  This is because the concept of "adequate protection" has constitutional roots, not just statutory ones.  See H.R. Rep. No. 95-595, 95th Cong., 1st Sess. at 339 (1977) (the concept of adequate protection "is derived from the Fifth Amendment protection of property interests."); see also In re Timbers of Inwood Forest Associates, Ltd., 793 F.2d 1380, 1390 (5th Cir. 1986), aff'd, 484 U.S. 365 (1988) ("Case law had made adequate protection of the secured creditor a major consideration long before the draft predecessor of the [1978 Bankruptcy Code] proposed to codify it as a requirement.")  Secured creditors are, in short, "entitled to constitutional protection for [their] bargained for property interest." In re Jug End in the Berkshires, Inc., 46 B.R. 892, 899 (Bankr. D. Mass. 1985).  Thus, although Congress did not overtly include "lack of adequate protection" as an example of proper cause in PROMESA's section 405(e), the United States Constitution nevertheless affords secured creditors the right to invoke that exception when seeking relief from the PROMESA automatic stay.

     c.  **Additional Considerations in Interpreting "Cause"**

          Before the Court transitions to its evaluation of whether adequate "cause" to vacate the stay exists in these

cases, it acknowledges the lack of a "one-to-one" relationship between section 405 of PROMESA and section 362 of the Bankruptcy Code.  In other words, it recognizes that the concept of "cause" embraced by the Court for the purposes of the PROMESA stay need not precisely mirror that adopted in the bankruptcy context.  Although the Court endorses the general analytical approach to "cause" followed in the bankruptcy arena, it is nevertheless mindful of the specific Congressional findings and the enumerated purposes of PROMESA's automatic stay contained within section 405 of the legislation.  These statutory provisions offer valuable insight into Congress' basic motive in including the stay provision and have no counterpart in section 362 of the Bankruptcy Code.  As such, the Court's resolution of the motions currently before it ought to be consistent with these provisions and should advance the larger, overarching purposes for which PROMESA was enacted.

### 2.   Outlining the Alleged Harms

Having established the parameters of the "for cause" standard that will apply to these lift-stay proceedings, the Court's next step is to drill down the precise "harms" that the parties seek to place on their respective sides of the balancing scale.

#### i.   Plaintiffs' Arguments and Evidence on Harm

##### a.   The Brigade Plaintiffs

The Brigade plaintiffs in Civil No. 16-1610 assert that they "will suffer serious constitutional injury" if the

stay is not vacated to allow their claims to go forward.  (Civil No. 16-1610, Docket No. 71 at p. 15.)  This injury would stem from the continued existence and application of certain "unconstitutional" provisions of the Moratorium Act, which "retroactively alter GDB bondholder rights by, among other things, adjusting bondholder priorities."  (Civil No. 16-1610, Docket No. 129 at p. 4.)  They allege that those provisions strip them of the benefit of their "bargained-for contractual rights," including "the right to recover on par with all other senior unsecured debt of GDB and the 'absolute and unconditional right' that their entitlement to principal and interest would not be changed without their consent."  (Civil No. 16-1610, Docket No. 87 at p. 10-11.)  Thus, unless the Court relieves them from the PROMESA stay, plaintiffs "will continue to suffer injury from [those] patently unconstitutional provisions of the Moratorium Act," which "purport to allow the restructuring of creditor claims against GDB without creditor consent" and "to *mandate* unfair discrimination among creditors of equal rank."  (Civil No. 16-1610, Docket No. 71 at p. 16-17.)

The Brigade plaintiffs also submit that the challenged provisions of the Moratorium Act have injected a "tremendous amount of legal uncertainty" into the voluntary negotiation process. (Civil No. 16-1610, Docket No. 129 at p. 4).  This uncertainty, according to plaintiffs' witness Mr. Bradley Meyer, has stymied meaningful restructuring negotiations between

the Commonwealth and its creditors.   Mr. Meyer's testimony indicated, for example, that Law 40, which amended the Moratorium Act, essentially derailed negotiations to consummate a restructuring of the GDB, even after plaintiffs and the GDB had successfully developed a framework agreement to guide those negotiations.   See 9/22/16 Tr. at 176:18-179:7.   In light of this evidence, the Brigade plaintiffs suggest that another major "harm" in refusing to allow their constitutional claims to go forward is the perpetuation of a destabilizing level of uncertainty, which ultimately keeps the parties from returning to their positions at the bargaining table.

        The Brigade plaintiffs contend, however, that by vacating the stay and allowing their claims to proceed, the Court has the opportunity to eliminate this "obstacle of uncertainty."   They argue that by adjudicating the constitutionality of the challenged provisions of the Moratorium Act now the Court can clarify the "rules of the road," which in turn will help foster the sort of voluntary restructuring negotiations that PROMESA was designed to facilitate.   To emphasize the importance of achieving that clarity, plaintiffs proffered the testimony of Mr. Meyer, who explained that:

> clarification around the rules of the road . . . is exceptionally important in terms of stabilizing the entire Commonwealth going forward. It's important because it provides certainty as to those relative priorities vis-à-vis creditors . . . within the Commonwealth so that we don't have confusion around how certain relative priority rights of creditors will be treated."

9/22/16 Tr. at 181: 12-24.  The Brigade plaintiffs further assert that adjudicating its claims will facilitate the work of the Oversight Board by definitively establishing "whether the framework for any restructuring can be based on the current priority structure specified by the Moratorium Act."  (Civil No. 16-1610, Docket No. 129 at p. 17.)  The Brigade plaintiffs maintain that resolving that issue now will provide the Board with both needed guidance and the beginnings of a "firm foundation," while also preventing it from "wast[ing] effort, time, and scarce resources" developing a restructuring that is premised on unconstitutional law.  Id. at p. 10.

### b.   Plaintiff National

Similar to the Brigade plaintiffs, plaintiff National in Civil No. 16-2101 asserts that, if the Court fails to exercise its discretion to vacate the stay, the Commonwealth defendants "will continue to infringe National's and other creditors' constitutional and contractual rights with impunity." (Civil No. 16-2101, Docket No. 36 at p. 8.)  More specifically, National contends that it will continue to be harmed by the "flagrantly unlawful" actions of the Puerto Rican government, which "wipe out" critical investor protections and permit the Commonwealth to assert control over secured revenues pledged to the repayment of the bonds that it insures.  National's evidence establishes that the Commonwealth has, in an "unprecedented" move, blocked roughly $11 million in combined secured monthly revenue

streams from reaching trust accounts maintained on behalf of PRHTA and AFICA bondholders.[5]  (Civil No. 16-2101, Docket No. 75 at p. 7-8.)  National argues that this misappropriation of bondholder collateral by the Commonwealth amounts to sufficient "cause" to vacate the PROMESA stay because it significantly and unconstitutionally harms its business as a bond insurer.  Id. Based on the expert testimony of Mr. Robert Lamb, National maintains that the continued diversion of pledged bond revenues will result in two distinct harms to its financial interests:  a forced reexamination of its reserve levels and "a higher capital charge by the rating agencies in order to maintain [its] rating" in the insurance market.  9/22/16 Tr. at 139:17-24.

National also shares the Brigade plaintiffs' concern that various provisions of the Moratorium Act, as well as the Executive Orders issued pursuant to it, have created a debilitating level of legal uncertainty.  National argues that this uncertainty has "hamper[ed] negotiated resolutions" and made it fundamentally "harder for the parties to reach agreement at the bargaining table."  (Civil No. 16-2101, Docket No. 75 at p. 15, 14.)  It therefore echoes the need to have the Court "determine the rules of the road now," and suggests that the adjudication of its

---

[5] During the evidentiary hearing, National's expert witness on municipal finance, Mr. Robert Lamb, testified that PRHTA's secured creditors are losing $10.6 million dollars each month in toll revenue collateral, and that AFICA's secured bondholders are losing approximately "$500,000 a month" in UPR lease payment collateral. 9/22/16 Tr. at 102:16-20, 100:3-6.

Civil Nos. 16-1610, 16-2101, 16-2257, 16-2510 (FAB)          26

constitutional claims would "help provide the certainty necessary to rebuild trust with creditors." Id. at p. 6, 15.  Allowing the Commonwealth "to hide behind the stay to avoid a reckoning on the constitutionality of its unilateral stripping of liens and diversion of assets," on the other hand, would only "prolong uncertainty and keep parties away from the bargaining table." Id. at p. 15, 6.

c.   **The Trigo Plaintiffs**

The Trigo plaintiffs in Civil No. 16-2257 reiterate the same basic harm emphasized by both the Brigade plaintiffs and National.  They argue that the Moratorium Act and the Executive Orders continue to cause them constitutional injury by "unilaterally divert[ing] funds from agencies and instrumentalities [of the Commonwealth] . . . in patent violation of creditor rights and without a vestige of accountability." (Civil No. 16-2257, Docket No. 52 at p. 6.)  Adjudication of their constitutional claims is therefore needed to put an end to the Commonwealth's "confiscatory unconstitutional actions," which "deplete assets and resources" that otherwise "could be available to pay all or part of [the] bondholders' interest and principal." Id. at p. 5, 2.

The Trigo plaintiffs posit that vacating the stay would also help to "eliminate destabilizing and unproductive uncertainty," provide guidance to the parties and the Oversight Board, and ensure that all creditors have the chance to participate

Civil Nos. 16-1610, 16-2101, 16-2257, 16-2510 (FAB)        27

in a restructuring process that is both "fair and orderly." Id. at pp. 5-7 (citing PROMESA § 405(m)(4)).  They argue that the looming harm if the stay is not vacated includes not only the "further chaos and complication" that would ensue if parts of the Moratorium Act are later declared unconstitutional, but also the continued existence of a "slant[ed . . . playing field" on which certain creditors are effectively reduced "to mere sideline spectators." Id. at p. 14, 5.

### d.   Plaintiff U.S. Bank

Unlike the three sets of plaintiffs discussed above, plaintiff U.S. Bank in Civil No. 16-2510 does not seek relief from PROMESA's automatic stay merely to obtain adjudication of its underlying constitutional claims against the Commonwealth. Rather, it requests that the stay be vacated so that it may also: (1) compel UPR - through a preliminary injunction issued concurrently by the Court - to transfer certain pledged revenues to the trust accounts held for the benefit of UPR bondholders, and (2) apply funds currently held in those trust accounts in accordance with the terms of the relevant trust agreement.  See Civil No. 16-2510, Docket No. 3 at p. 28.

U.S. Bank argues that the requisite "cause" for granting its first request for relief is established by its lack of adequate protection in the pledged revenues, which serve as hard collateral for the payment of the UPR bonds.  U.S. Bank contends that these funds, which include student tuition and fees, will

continue to be diverted and expropriated by the Commonwealth and UPR during the pendency of the stay in order "to meet expenses other than debt service." Id. at p. 6.  It further alleges that, once diverted, the pledged revenues are "gone forever" and that "[n]one of the after-the-fact remedies provided by the Moratorium Act or PROMESA" is sufficient to replace them. (Civil No. 16-2510, Docket No. 65 at p. 7, 3.)  Rather, U.S. Bank claims that the pledged revenues "are the only reliable source of repayment" for the UPR bonds and that "[a]ny damages remedy would merely substitute, for hard collateral, an unsecured claim that the Commonwealth or UPR cannot pay." (Civil No. 16-2510, Docket No. 3 at p. 16, 6.)  Thus, if the stay is not vacated to halt the "plundering of its collateral," U.S. Bank will allegedly be converted "from a fully secured creditor entitled to be paid in full to a second-priority unsecured creditor that may eventually be paid pennies on the dollar." (Civil No. 16-2510, Docket No. 40 at p. 3.)

As for the disbursement of funds currently held in its trust accounts, U.S. Bank contends that relief from stay is appropriate because the Commonwealth itself "does not appear to have any objection" to the application of funds in U.S. Bank's possession.  (Civil No. 16-2510, Docket No. 3 at p. 27.)

### ii.  The Commonwealth's Arguments and Evidence on Harm

The Commonwealth defendants maintain that vacating the stay would cause significant harm to the Government of Puerto

Rico and its people.  They argue, for example, that granting relief
to the plaintiffs in these cases would further divert important
Commonwealth personnel and resources from addressing the financial
crisis and the Government's obligations under PROMESA.  (Civil
No. 16-1610, Docket No. 131 at p. 3-4.)  At the hearing, the
defendants presented the testimony of Assistant Secretary of the
Treasury Yaimé Rullán-Cabrera as support for this point.
Ms. Rullán's testimony demonstrated how the burdens of litigation
at this preliminary stage of the proceedings are "already drawing
Commonwealth officials away from their governmental
responsibilities."  Id. at p. 3.  Ms. Rullán testified that she has
had to appear in court on several occasions and that Commonwealth
officials "have had to provide all the documentary information in
preparation for this and other litigation."  9/23/16 Tr. at 75:22-
25, 16–17.  These burdens interfere not only with government
officials' efforts to govern the Commonwealth on a day-to-day
basis, but also with their work in helping to "complete what would
be a sustainable fiscal recovery plan."  Id. at 90:9–12.  Citing
these concrete burdens associated with litigation, defendants argue
that vacating the stay in these cases "would only result in more,
and potentially more damaging, diversion of the Commonwealth's
personnel and resources."  (Civil No. 16-1610, Docket No. 131 at

p. 5.)[6]  They conclude, therefore, that granting plaintiffs their
requested relief would directly contravene the PROMESA stay's
purpose of "provid[ing] the Government of Puerto Rico with the
resources and the tools it needs to address an immediate existing
and imminent crisis."  PROMESA § 405(n)(1).

        The defendants, including GDB, also argue that
granting relief in these cases could thwart the Commonwealth's
ability to perform basic government functions by "upending
everything that [it has] been relying on for the past several
months."  9/22/16 Tr. at 48:25-49:1.  In other words, by producing
"the premature dismantling of statutory provisions created to
address the current fiscal emergency in Puerto Rico," (Civil
No. 16-1610, Docket No. 81 at p. 13), vacating the stay here might
fundamentally "disrupt the Government's processes for managing the
Commonwealth" and "interfere with the government's ability to
provide essential services to residents of the Commonwealth."
(Civil No. 16-1610, Docket No. 131 at p. 5.); see also Civil
No. 16-2257, Docket No. 54 at p. 14-15 (GDB emphasizing "the burden
[that] a judgment invalidating all or part of the Moratorium Act

_____

        [6] In its own separate post-hearing memorandum, Civil No.
16-2257, Docket No. 54, GDB reinforces this point regarding the
burden and distraction that further lift-stay litigation would
cause to the Commonwealth and its instrumentalities.  GDB argues
that a decision to vacate the stay in these cases would "engender
tremendous amounts of work for GDB, . . . involve distraction of
the Commonwealth and GDB officers" and divert "resources now
focused not only on the PROMESA process but on continuing to
operate and provide essential services to the public in the face of
the Commonwealth's fiscal crisis."  (Civil No. 16-2257, Docket
No. 54 at pp. 12-13.)

and executive orders will impose on the Commonwealth and its instrumentalities.")  The testimony of Ms. Rullán was proffered to substantiate this danger of "calling into immediate question the ground rules established by the Moratorium Act and executive orders" upon which the Commonwealth's day-to-day operations are currently based.  (Civil No. 16-2257, Docket No. 54 at p. 8.) Ms. Rullán testified that the invalidation of the Moratorium Act and related Executive Orders would severely restrict the Commonwealth's ability to manage daily demands with current assets. See 9/23/16 Tr. at 88:3-18.  This difficulty, in turn, would eventually require Commonwealth officials "to just paralyze the government," an act that would impede their ability to "tend to the emergency situation" that continues to unfold on the island.  Id. at 88:12-89:1.  Based on this testimony, defendants conclude that vacating the stay here would result in a "death spiral" in which a "paralyzed" government would ultimately be prevented from funding "the essential services necessary to promote economic stability and growth."  (Civil No. 16-1610, Docket No. 131 at p. 5.)

        The Commonwealth defendants additionally allege that granting relief to plaintiffs in these cases is likely to "touch off more lawsuits" and "invite more requests to lift the PROMESA stay," something that will further divert the Commonwealth's limited resources and "deprive the Commonwealth of breathing room from litigation that PROMESA is supposed to provide."  Id. at p. 7. To support this claim, defendants offered the testimony of

Dr. Jonathan Arnold.  Dr. Arnold opined that plaintiffs who "have already filed a case will also seek to have stays lifted" and that the result will be a "wave of litigation, first at the stage of petitioning to lift the stay, and then to the extent that it's granted, then it will be the ongoing litigation after that." 9/23/16 Tr. at 223:15-18.  Based on this testimony, the defendants conclude that granting relief here will open the litigation floodgates and encourage "a slew of . . . other creditors" currently "on the sidelines" to pursue their claims against the Commonwealth outside the PROMESA framework.[7]  (Civil No. 16-1610, Docket No. 131 at p. 6.)  In this way, vacating the stay "would force the Commonwealth to divert its attention from negotiating a voluntary resolution with its creditors to defending costly lawsuits, the exact opposite of what Congress intended."  (Civil No. 16-2510, Docket No. 33 at p. 8.)

          Finally, the Commonwealth defendants argue that vacating the stay will fundamentally inhibit the Oversight Board's central role in the PROMESA process.  They contend that granting the requested relief here will:  (1) interfere with the Board's

---

[7] The United States and GDB also raise this concern in their respective filings with the Court.  In its Statement of Interest, the United States warns of "the potential cascading effect that granting relief to one creditor may have on the overall scheme designed by PROMESA, as there may be numerous other similarly situated creditors."  (Civil No. 16-1610, Docket No. 116 at p. 6.) GDB posits that "the effects of lifting the stay would reverberate beyond these four cases" by "leading to a cascade of further litigation and lift-stay proceedings" in which the Commonwealth and GDB would be forced to participate.  (Civil No. 16-2257, Docket No. 54 at pp. 13-14.)

need to address the financial crisis on a "comprehensive basis,"
and (2) thwart its ability to organize a consolidated restructuring
approach effectively.  (Civil No. 16-1610, Docket No. 131 at p. 7.)
With respect to the first point, defendants emphasize Congress'
explicit finding that a "comprehensive approach to fiscal,
management, and structural problems and adjustments that exempts no
part of the Government of Puerto Rico is necessary . . . to
restructure debts in a fair and orderly process."  PROMESA
§ 405(m)(4).  Defendants maintain that allowing these plaintiffs to
go forward with their claims would work against this "comprehensive
approach" and hinder the work of the Oversight Board by preventing
it from crafting a restructuring that is fair and equitable to all
stakeholders.  To support this position, defendants offered the
testimony of Ms. Elizabeth Abrams, a managing director at Millstein
& Company who leads the restructuring team for Puerto Rico.
Ms. Abrams testified that "[t]he Oversight Board has fairly broad
authority to oversee, for lack of a better word, the negotiations
to set the rules and ultimately to approve the restructuring
agreements that are reached."  9/23/16 Tr. at 139:15-18.
Consequently, if the stay were to be vacated here to allow these
plaintiffs to litigate a solution in court, the purpose of the
Oversight Board in facilitating an organized and coordinated
restructuring process "is effectively preempted."  Id. at
139:19-22.

With regard to the second point, defendants emphasize "the advantage of a consolidated approach to restructuring the debts of an entity like Puerto Rico." (Civil No. 16-1610, Docket No. 131 at p. 10.) A consolidated restructuring approach, Ms. Abrams testified, represents "the optimal outcome" and "the most fair and equitable way for the Commonwealth . . . and for the creditors to determine what the appropriate recoveries are, given that all of their debt is . . . effectively supported by the same economy." 9/23/16 Tr. at 101:25-102:6. Defendants maintain that one of the benefits of having an Oversight Board at the center of the PROMESA process is that it is capable of orchestrating that particular line of attack. Indulging plaintiffs' requests for "piecemeal resolution" of their claims, however, is "antithetical" to the concept of consolidated restructuring and would therefore frustrate the Board's ability to coordinate any approach to resolving Puerto Rico's fiscal crisis that is based on that principle. (Civil No. 16-1610, Docket No. 131 at pp. 11-12.)

### 3.  Balancing the Equities

Having outlined the harms and interests at stake on both sides of this contentious issue, the Court must now decide whether any of the plaintiffs in these consolidated cases have carried their burden of showing adequate "cause" for relief from the automatic stay pursuant to section 405(e)(2) of PROMESA. For the

reasons developed below, the Court concludes that none of them has done so.

> ### i. With Respect to Plaintiffs' Constitutional Claims, the Balance of Equities Favors that the Stay be Maintained

Because plaintiffs have the initial burden of showing proper cause for relief from stay, see In re Bogdanovich, 292 F.3d 104, 110 (2d Cir. 2002), the Court begins by critically analyzing the nature and extent of the harm that they allegedly face if their requested relief is denied.

As developed above, plaintiffs in each of these cases assert that leaving the stay in place will subject them to further constitutional injury. This injury would arise from the continued existence and application of certain "unlawful" provisions of the Moratorium Act and related Executive Orders issued by the Governor of Puerto Rico. While the plaintiffs' interests and arguments are not identical, they collectively assert that those actions by the Commonwealth unconstitutionally (i) deprive them of bargained-for contractual rights and security interests; (ii) reorder priorities among creditors; (iii) discriminate among creditors with similar priorities; and (iv) attempt to impose a debt restructuring on creditors without their consent.

The mere fact that plaintiffs bring claims pursuant to the Federal and Commonwealth Constitutions does not, however, entitle them to automatic circumvention of the PROMESA stay. See,

e.g., In re City of San Bernardino, 2016 WL 5019089, at *5 (C.D. Cal. 2016) (finding that there is no exception to the Bankruptcy Code's automatic stay for constitutional claims, even if that category of claims is "deserving" of an exemption.)   Rather, plaintiffs must still satisfy the relevant balancing analysis applicable to all proceedings seeking relief from stay "for cause shown."  That is, they must still demonstrate that the harm flowing from the continuation of those alleged constitutional violations outweighs the detriment that the Commonwealth would suffer if the stay were vacated to address them.

        In each of these four cases, the evidence suggests that the true harm resulting to plaintiffs from the continued existence of the challenged provisions of the Moratorium Act and related Executive Orders is largely (if not purely) pecuniary in nature.  For the Brigade plaintiffs, the failure to vacate the stay to address their constitutional claims ultimately raises the specter of preferential transfers of GDB monies to other creditors, something which inherently decreases their overall share of a finite pool of GDB assets.  For National, the harm - brought about by the continued misappropriation of $11 million in pledged revenues intended to secure repayment of the bonds that it insures

- is predominantly financial.[8]  See 9/22/16 Tr. at 20:12-14 ("I
don't know what more harm – what more concrete harm could possibly
be shown than people taking our money every single month.")  For
the Trigo plaintiffs, the harm is found in the continued
delinquency on interest and principal payments owed to them, as
well as a reduction in the market (as opposed to face) value of
their bonds.  See Id. at 29:19-23 ("The Plaintiffs . . . were thus
deprived of their absolute and unconditional . . . right to receive
payment of principal and interest of their bond without notice or
consent."); id. at 231:21-25 ("Q. Other than . . . the lack of
payment of interest since May, is that the extent of your damages
to date?  A.  Yes.  And the fact that the value of those bonds have
reduced considerably.")  And for U.S. Bank, the harm consists of
the prolonged diversion of pledged revenues that serve as hard
collateral for UPR bondholders.  See Civil No. 16-2510, Docket
No. 3 at p. 6.  Thus, between the four sets of plaintiffs in these
cases, the true harm in upholding the automatic stay appears to be,
as National suggested at the evidentiary hearing, allowing the
Commonwealth to continue "taking other people's money away under
color of the Moratorium Act."  See 9/22/16 Tr. at 19:17-19.

---

[8] National argues that the continued monthly diversion of this
sum of money by the Commonwealth will jeopardize its liquidity and
produce a concomitant downgrade in its credit rating by the rating
agencies.  While those adverse consequences are theoretically
possible, National simply has not alleged sufficient facts to
convince the Court that this harm is anything more than speculative
in nature.

The Court agrees with the Commonwealth defendants, GDB, PRPFC and UPR that this monetary damage incurred by plaintiffs during the stay could be quantified and therefore would not be "permanent" or "irreparable." (Civil No. 16-1610, Docket No. 131 at p. 13; Civil No. 16-2257, Docket No. 54 at p. 11; Civil No. 16-2510, Docket No. 61 at pp. 3-4; see also K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 914 (1st Cir. 1989) ("[I]f money damages will fully alleviate harm, then the harm cannot be said to be irreparable.") Rather, this financial harm could effectively be dealt with through the voluntary negotiations process fostered by

PROMESA and supervised by the Oversight Board,[9] or through future title III restructuring proceedings.  Any financial loss sustained over the next few months could also be handled through certain remedial provisions found within PROMESA, provisions that were built into the statute precisely to offer greater "protection of creditors" from the unlawful transfer of their interests.  <u>See</u> PROMESA § 407.  Section 407(a), for example, provides that "if any property of any territorial instrumentality . . . is transferred in violation of applicable law under which any creditor has a valid

_____

[9] The Brigade plaintiffs, National and the Trigo plaintiffs all assert that the Moratorium Act and the Executive Orders have fundamentally stymied the voluntary negotiations process by obfuscating the "rules of the road" governing creditor priorities and the Commonwealth's existing debt structure.  <u>See, e.g.</u>, 9/22 Tr. at 15:18-19.  (Brigade plaintiffs claiming that the Moratorium Act "was a hand grenade that was thrown into the restructuring.").  They further suggest that meaningful, productive levels of cooperation at the proverbial bargaining table will remain elusive until the Court resolves the constitutionality of the Commonwealth's challenged actions.  <u>See, e.g.</u>, Civil No. 16-2101, Docket No. 75 at p. 12. (National arguing that, "[t]o negotiate effectively, parties must know whether their interests are secure, and this requires a ruling on the Moratorium Act's constitutionality.")  At the same time, however, the Brigade plaintiffs admit that they were able successfully to negotiate a framework - complete with key terms - for a restructuring of GDB in the aftermath of the Moratorium Act.  <u>See</u> 9/22 Tr. at 190:6-10; 199:5-18.  Other evidence also suggests - but does not definitively establish - that negotiations between the parties continued even after the Moratorium Act was amended in May of 2016.  <u>See</u> 9/23 Tr. at 127:14-17.  In light of this evidence, the Court is skeptical that adjudication of plaintiffs' constitutional claims is needed to restore voluntary negotiations between the Commonwealth and its various creditors.  Rather, the Court agrees with the Commonwealth defendants that, even without resolution of the constitutional issues, negotiations are possible.  Indeed, the additional, supervisory involvement of the Oversight Board should make the possibility of fruitful consensual negotiations all the more likely.

pledge of, security interest in, or lien on such property . . . then the transferee shall be liable for the value of such property." Id. § 407(a). Creditors are empowered to enforce their rights pursuant to section 407(a) "by bringing an action in the U.S. District Court for the District of Puerto Rico after the expiration or lifting of the stay of section 405." Id. § 407(b). Taken together, these two provisions establish a mechanism for the negation and recovery of any improper transfer that harms a creditor's interests while the Oversight Board is in existence. Though admittedly imperfect, that remedial vehicle will be available to allow plaintiffs in these cases to undo any monetary loss that they suffer during the pendency of the automatic stay. Despite their arguments to the contrary, there is simply no compelling reason why plaintiffs cannot be expected to utilize it.

In contrast to the monetary, fixable harm faced by plaintiffs if their relief is denied, vacating the stay has the potential to cause serious prejudice to the Commonwealth defendants and the PROMESA process. Although the Court disagrees that vacating the stay would engender crushing levels of additional work for the Commonwealth in defending **these particular cases**, it is nevertheless mindful of the impact that granting relief here could have in spawning additional proceedings to vacate the stay. The Court is, in other words, sensitive to the possibility of provoking a massive "wave of litigation" by other creditors who are eager to obtain relief outside the PROMESA process. In addition to these

four consolidated actions, the Court counts ten other lawsuits that have been commenced against the Commonwealth, its covered instrumentalities, and its public officials in this district.[10] This fact - combined with the intuitive observation that vacating the stay "will invite other participants in the litigation process to seek to do the same," 9/23/16 Tr. at 223:4-6 - is enough to convince the Court that granting plaintiffs' their desired relief will only embolden more creditors and spark the type of race to the courthouse that the PROMESA stay was designed to guard against. See H.R. Rep. No. 114-602, at 52 (2016) (noting that the automatic stay is "critical" in part because "it preempts a rush to the courts by aggrieved creditors - an event that could increase the impact of and accelerate Puerto Rico's debt crisis.")

While it is true that the Court would be able to handle additional lift-stay motions on a case-by-case basis, the Commonwealth would nevertheless be obligated to respond to each and every proceeding initiated against it. The Court agrees with the Commonwealth defendants, GDB, and PRPFC that the distraction and expense inherent in this "cascading" litigation would stretch the

---

[10] See Assured Guar. Corp. v. García Padilla, Civil No. 16-1037; Fin. Guar. Ins. Co. v. García Padilla, Civil No. 16-1095; Ambac Assurance Corp. v. Puerto Rico Highways and Transp. Auth., Civil No. 16-1893; Peaje Investments LLC v. García Padilla, Civil No. 16-2365; Lex Claims, LLC v. García Padilla, Civil No. 16-2374; Assured Guar. Corp. v. Puerto Rico, Civil No. 16-2384; Voya Institutional Trust Co. v. University of Puerto Rico, Civil No. 16-2519; Altair Global Credit Opportunities Fund (A), LLC v. García Padilla, Civil No. 16-2696; Scotiabank de Puerto Rico v. García Padilla, Civil No. 16-2736; Oriental Bank v. García Padilla, Civil No. 16-2877.

government's resources and personnel, and quickly deprive the Commonwealth of the breathing room that Congress believed it would need both to fulfill its crucial obligations to the Oversight Board and to reopen constructive dialogue with its creditors. See Civil No. 16-1610, Docket No. 131 at p. 6-7; Civil No. 16-2257, Docket No. 54 at p. 13-14.) A denial of stay relief in these cases would therefore help to advance PROMESA's explicit purpose of allowing "the Government of Puerto Rico a limited period of time during which it can focus its resources on negotiating a voluntary resolution with its creditors instead of defending numerous, costly creditor lawsuits." PROMESA § 405(n)(2).

The Court also finds that vacating the stay here would harm the PROMESA process by undermining the comprehensive, consolidated restructuring approach that the statute was ultimately designed to facilitate. In drafting PROMESA, Congress specifically found that "[a] **comprehensive approach** to fiscal, management, and structural problems and adjustments that exempts no part of the Government of Puerto Rico **is necessary** . . . for the Government of Puerto Rico to restructure debts in a **fair and orderly process**." PROMESA § 405(m)(4) (emphasis supplied). By forcing "all claims [to be] considered in parallel", see 9/23/16 Tr. at 222:7-11 (J. Arnold), this type of approach arguably helps "to ensure all creditors have a fair opportunity to consensually renegotiate terms of repayment." PROMESA § 405(m)(5)(B). The parties themselves appear to agree on the inherent advantage in adopting a

comprehensive, consolidated approach to dealing with Puerto Rico's debt crisis.  See 9/22/16 Tr. at 192:4-6. ("Q. That is, if you want to fix the problem and you can do it, you would go for a consolidated approach; true? A.  If you could, yes.")  (B. Meyer); 9/23/16 Tr. at 101:25-102:2 ("the optimal outcome for the Commonwealth is to reach a settlement with all of its . . . holders of its tax supporte[d] debt at once.") (E. Abrams); id. at 222:5-11 (J. Arnold).  Allowing the creditors in these actions to litigate their individual solutions in court, however, would interfere with the orchestration of this approach.  It would, in essence, permit them to "jump to the front of the line" to protect their own interests before other creditors have had the opportunity to defend

theirs.[11]  9/22/16 Tr. at 60:25-61:1.  All stakeholders, including
the Oversight Board, collectively deserve the chance to avoid this
piecemeal approach to resolving Puerto Rico's fiscal emergency and
to allow the PROMESA process to function as designed.  In other
words, they deserve the opportunity to pursue the "ideal" solution
of "solv[ing] the entire puzzle" at once through a comprehensive,

---

[11] Plaintiffs vehemently maintain that they are interested only
in challenging the constitutionality of the Moratorium Act, and
that the adjudication of their claims therefore will not, as
defendants allege, "cleave off value" to the detriment of other
stakeholders.  See, e.g., 9/23 Tr. at 143:22-145:10.  In theory,
plaintiffs are correct about this: a decision invalidating the
Moratorium Act would not, on its own, decrease the total assets
available to all creditors in a consolidated, global restructuring.
The Court nevertheless rejects plaintiffs' attempts to pull the
wool over its eyes. As Dr. Arnold noted:

> "[I]t's natural to think that businesses and their
> lawyers are not incentivized just to challenge the
> constitutionality of laws for the sake of the
> public good to get an answer to that question.
> That's not the end of the line.  The end point is
> then to use the result of that in order to get
> money later.  So it's obvious what the steps in
> the chain will be leading down the road from
> here."

9/23 Tr. at 223:19-224:2; see also id. at 144:14-18 ("Presumably,
the creditors are looking . . . for relief from the stay and to
pursue their claims about the constitutionality of the Moratorium
Act so that they can pursue remedies against the issuer.") (E.
Abrams).  Like Dr. Arnold and Ms. Abrams, the Court is skeptical of
plaintiffs' true motives and agrees with the Commonwealth
defendants, GDB and PRPFC that their ultimate aim is to obtain
money judgments against their borrowers or "to gain an advantage in
anticipated restructuring proceedings." (Civil No. 16-1610, Docket
No. 131 at p. 15-16; Civil No. 16-2257, Docket No. 54 at p.11.)
Because the acquisition of that sort of advantage would work
against a comprehensive restructuring that is fair and equitable to
all stakeholders, it would also frustrate Congress' intent in
designing PROMESA.   The Court is unwilling to risk these
undesirable consequences of a decision to vacate the stay here.

consolidated restructuring approach.  See 9/22 Tr. at 191:21-25 (B. Meyer).  Maintaining the stay in these cases would help to preserve that model option for the benefit of all parties.

        Based on the foregoing analysis, the Court finds that the harm to plaintiffs in preventing their constitutional claims from going forward does not outweigh the likely harm that vacating the stay to address those claims would cause to both the Commonwealth defendants and the PROMESA process.  Because the equities tilt against them, plaintiffs have not demonstrated the level of "cause" necessary to obtain their requested relief. Accordingly, their respective requests to lift PROMESA's automatic stay are **DENIED**.[12]

### 4.  The Court Need Not Resolve Plaintiffs' Constitutional Claims at This Time

        Pursuant to the "for cause" standard developed earlier, the fact that plaintiffs' threatened harm is of a "lesser" stripe

---

[12] This is not, of course, to say that the Court gives credence to each of the Commonwealth's stated harms in its balancing calculus.  It is not, for example, persuaded by the defendants' postulation of an apocalyptic "death spiral" following invalidation of the Moratorium Act.  Heeding the expert opinion of Dr. Carlos Colon de Armas that "the Government of Puerto Rico has the revenues to cover essential services and pay its debt commitments," the Court finds the Commonwealth's hypothesized catastrophe to be a melodramatic exaggeration divorced from reality.  See 9/23 Tr. at 28:11-13.  Nevertheless, the Court's holding regarding the lack of "cause" in these cases is driven by a simple, reasoned determination: that the fixable financial harm confronted by the plaintiffs if the stay remains in effect does not, on balance, outstrip the harm to the Commonwealth and the PROMESA process that a decision vacating the stay would engender.  That the defendants advance certain implausible arguments regarding the precise extent of that harm does not change this basic, dispositive conclusion.

than that faced by the Commonwealth is, on its own, sufficient to deny plaintiffs their requested relief. Nevertheless, the Court identifies yet another reason militating in favor of a decision to maintain the PROMESA stay in these consolidated actions:  the need to comply with the principle of constitutional avoidance.[13]

It is the province of the Court, as an Article III Court, to interpret the Constitution. See Marbury v. Madison, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is.")  This basic reality has been acknowledged by the parties, who recognize that neither PROMESA nor the Oversight Board usurps the Court's authority to address constitutional issues that are brought before it. Nevertheless, the Court recognizes that it is also bound by "[t]he principle of constitutional avoidance, rooted in Article III as well as in principles of judicial restraint."  Sony BMG Music Entm't v. Tenenbaum, 660 F.3d 487, 510 (1st Cir. 2011).  The Court finds that this principle governs here.

---

[13] The fact that the constitutionality of the Moratorium Act and Executive Orders is not the issue before the Court in these lift-stay proceedings does not render the doctrine of constitutional avoidance inapposite here. In essence, the Court has two options before it.  It can:  (1) vacate the stay to adjudicate plaintiffs' challenges to the Moratorium Act now, or (2) maintain the stay and leave room for the PROMESA process and action by the Oversight Board to deal with those provisions.  The former option necessarily requires the Court to address constitutional issues, while the latter allows time for those issues to disappear or to be modified extrajudicially.  Because this second avenue allows the Court to avoid reaching constitutional questions before absolutely necessary, the principle of constitutional avoidance is applicable and counsels in favor of pursuing that option here.

"A fundamental and long-standing principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." Lyng v. Nw. Indian Cemetery Protective Ass'n, 485 U.S. 439, 445 (1988); see also Camreta v. Greene, 563 U.S. 692, 705 (2011) (emphasizing the rule that courts must avoid resolving constitutional questions unnecessarily); Hein v. Freedom From Religion Found., Inc., 551 U.S. 587, 598 (2007) ("[F]ederal courts . . . must 'refrai[n] from passing upon the constitutionality of an act . . . unless obliged to do so in the proper performance of our judicial function.'" (quoting Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc., 454 U.S. 464, 474 (1982))); United States v. Resendiz-Ponce, 549 U.S. 102, 104 (2007) ("'It is not the habit of the Court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case.'" (quoting Ashwander v. Tenn. Valley Auth., 297 U.S. 288, 347 (1936) (Brandeis, J., concurring))); Spector Motor Serv. v. McLaughlin, 323 U.S. 101, 105 (1944) ("If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable.") The courts of appeals, including the First Circuit Court of Appeals, have consistently heeded this command from the Supreme Court to avoid unnecessary constitutional rulings.  See, e.g.,

Civil Nos. 16-1610, 16-2101, 16-2257, 16-2510 (FAB)         48

Buchanan v. Maine, 469 F.3d 158, 172 (1st Cir. 2006); United States
v. Coker, 433 F.3d 39, 50-51 (1st Cir. 2005).

      Here, the passage of PROMESA and the establishment of the
Oversight Board creates the distinct possibility that any ruling by
the Court regarding the constitutionality of the Moratorium Act and
its related Executive Orders will become moot.  In fulfilling its
congressional mandate to help Puerto Rico "achieve fiscal
responsibility and access to the capital markets," PROMESA
§ 101(a), the Board has the ability, for example, to develop and
approve a Fiscal Plan that curtails or even prohibits the
enforcement of those challenged provisions.  It can also
unilaterally dismantle them by exercising its "sole discretion" to
rescind any law that "alters pre-existing priorities of creditors
in a manner outside the ordinary course of business or inconsistent
with the territory's constitution or the laws of the territory."
PROMESA § 204(c)(3)(B).  Moreover, in the event that debt
adjustment proceedings become necessary, the provisions of title
III may effectively unwind the government's controversial actions.
Section 303(1), for example, prohibits the application of any
territory law prescribing a method of composition of indebtedness
or moratorium on the indebtedness of the territory or its
instrumentalities to a creditor who does not consent to the
composition or moratorium. PROMESA, § 303(1).  Section 303(3)
further preempts unlawful executive orders that alter, amend, or

modify the rights of holders of debt, or that divert funds from one instrumentality to another or to the territory.  Id. § 303(3).

All of this is to show that, in drafting PROMESA, Congress intentionally provided many of the tools needed to deal effectively with the "unconstitutional" conduct that plaintiffs collectively challenge here.  Because PROMESA's provisions and action by the Oversight Board are capable of "eliminat[ing]" - "or at the very least materially reshap[ing]" - the constitutional issues presented in these consolidated actions, it is unnecessary and premature for the Court to pass judgment on those issues at this time.  See Sony BMG Music Entm't, 660 F.3d at 511 (1st Cir. 2011).  Accordingly, declining to vacate the automatic stay here puts the Court in compliance with the principle of judicial restraint and its obligation to "avoid reaching constitutional questions in advance of the necessity of deciding them." Lynq, 485 U.S. at 445.

## 5.  U.S. Bank Does Not Lack Adequate Protection

As discussed above, the Court finds that a secured creditor's lack of adequate protection in its collateral can establish the requisite "cause" for vacating the PROMESA stay pursuant to section 405(e).  The essential question in Civil No. 2510 therefore becomes whether U.S. Bank's interest in UPR's pledged revenues is in fact adequately protected against loss from the Commonwealth's acts of diversion.  The Court holds that it is.

The term adequate protection is not explicitly defined in the Bankruptcy Code.  Courts, however, have determined that "[t]he focus of the [adequate protection] requirement is to protect a secured creditor from diminution in the value of its interest in [its] particular collateral during the period of use by the debtor." In re Satcon Tech. Corp., 2012 WL 6091160, at *6 (Bankr. D. Del. 2012); see also In re Swedeland Dev. Group, Inc., 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy."); In re Born, 10 B.R. 43, 48 (Bankr. S.D. Tex. 1981) ("The very heart of the concept of adequate protection is to assure the secured creditor that as the bankruptcy procedures unfold he will not be faced with a decrease in the value of his collateral."); In re Dynaco Corp., 162 B.R. 389, 393 (Bankr. D.N.H. 1993) ("The Court must ensure that, to the extent the debtor is entitled to use cash collateral, there is adequate protection of the creditor's security interest so as to maintain the 'benefit of the bargain' that the secured creditor originally made with the debtors.")  Thus, the concept of adequate protection generally requires a debtor to propose some alternative form of relief that will preserve the secured creditor's interest in the collateral, pending the outcome of bankruptcy proceedings.  Indeed, "[i]t is well settled that the debtor bears the burden to demonstrate that a creditor is adequately protected." In re S. Side House, LLC, 474 B.R. 391, 408 (Bankr. E.D.N.Y. 2012).  The exact form of

protection, however, is flexible.  See In re Monroe Park, 17 B.R.
934, 940 (D. Del. 1982) (noting that adequate protection in the
context of relief from the automatic stay "is a flexible concept
which requires a Court to make decisions on a case-by-case basis,
after full consideration of the peculiar characteristics common to
each proceeding.")  Such protection may include an additional or
replacement lien, periodic payments, or any other method that
provides the creditor with the "indubitable equivalent" of its
interest in the property.  See 11 U.S.C. § 361.

Here, the evidence unequivocally establishes that the
Commonwealth and UPR have engaged in the diversion of pledged
revenues that serve as hard collateral for the repayment of UPR
bondholders.  See 9/22 Tr. at 147-48.  U.S. Bank maintains that no
acceptable substitute for those pledged revenues is available, only
an unsecured second-priority claim against the Commonwealth, which
is "grossly inadequate given the Commonwealth's asserted and
adjudged inability to pay even its first-priority general
obligation bonds." (Civil No. 16-2510, Docket No. 65 at p. 7.)  In
arguing this lack of adequate protection, however, U.S. Bank
unjustifiably discounts provisions of both the Moratorium Act and
PROMESA that effectively preserve its contractual security interest
in UPR's pledged revenues.  See Moratorium Act § 204(a) (protecting
"the rights of a holder to any collateral, security interest or
lien that secures" an obligation that "was otherwise due or became
due before or during an emergency period" and "becomes payable at

the end of the covered period as a result of this Act."); PROMESA § 405(k) (providing that the automatic stay "does not discharge an obligation of the Government of Puerto Rico or release, invalidate, or impair any security interest or lien securing such obligation.") Because of these provisions, and because UPR'S pledged revenues are constantly replenished by an annual stream of student tuition and fee payments, U.S. Bank continues to hold a security interest in a stable, recurring source of income that will eventually furnish funds for the repayment of the UPR bondholders.  Though U.S. Bank will not receive the pledged revenues during the stay period,[14] this enduring security interest means that it faces only a "delay in recouping such funds," not a permanent loss of them.

     The Court finds that the existence of this continuing lien on a perpetual source of revenue satisfies the "flexible" standard applicable to determinations of adequate protection.  It therefore holds that the Commonwealth has carried its burden of showing that the UPR bondholders will, in due time, receive the "indubitable equivalent" of their current interest in UPR's pledged revenues.  Accordingly, plaintiff U.S. Bank's motion to lift the

_____

     [14] The fact that U.S. Bank will not have the benefit of additional UPR pledged revenues during the stay period is of no real consequence here.  U.S. Bank admits that there are sufficient funds in its reserve account to service the UPR bond debt until December 2017.  See 9/22 Tr. at 33: 17-18.  Because UPR bondholders would not miss a single principal or interest payment during the pendency of the automatic stay, they will suffer no financial harm if the stay is maintained.

stay for the purpose of enforcing a preliminary injunction against UPR is **DENIED**.

The Court, on the other hand, sees no reason to deny that part of U.S. Bank's motion seeking relief from stay in order to disburse monies held in its reserve account.  The funds held in that trust account are not subject to the Moratorium Act, <u>see</u> Moratorium Act § 103(l)(ii), and the Commonwealth has not specifically opposed this request at any time during these proceedings.  The Court therefore **GRANTS** that portion of the motion and **VACATES** the PROMESA stay for the limited purpose of allowing U.S. Bank to transfer those funds in accordance with the terms of the relevant trust agreement.

## C.   A Brief Word to the Commonwealth Defendants

In a previous memorandum and order denying other plaintiffs relief from the PROMESA stay,[15] the Court urged the Commonwealth defendants not to waste time in reinvigorating consensual negotiations with its various creditors.  The Court reiterates that same counsel here.

At bottom, the Commonwealth has three - theoretical - options going forward.  In order to help extricate itself from its current financial predicament, it can:  (1) make a serious commitment to negotiate voluntarily with its creditors, (2) seek to be placed into debt restructuring proceedings pursuant to title III of

---

[15] <u>See</u> Civil No. 16-2365, Docket No. 74; Civil No. 16-2384, Docket No. 59; Civil No. 16-2696, Docket No. 68.

PROMESA, or (3) recommence making payments to all of its bondholders.  The third option is undoubtedly the most ideal, and is expressly permissible during the PROMESA stay period.  See PROMESA § 405(l) (providing that the automatic stay provision does not "prohibit the Government of Puerto Rico from making any payment on any Liability when such payment becomes due.")  Taking the Commonwealth at its word that its outstanding debt obligations are truly not payable, however, that option is an infeasible avenue to fiscal redemption.  Although the second option may become necessary in the future, debt adjustment proceedings pursuant to title III must first be certified by the Oversight Board.  See PROMESA § 302(2).  This certification, in turn, requires a would-be debtor to prove to the Board that it has, among other things, made meaningful attempts to reach a consensual resolution with its creditors.  See Id. § 206(a) ("The Oversight Board, prior to issuing a restructuring certification regarding an entity . . . shall determine, in its sole discretion, that . . . the entity has made good-faith efforts to reach a consensual restructuring with creditors.")  Thus, the second option will not become available to the Commonwealth and its covered instrumentalities unless and until the first has been faithfully attempted.  In light of this fact, the earnest revitalization of the voluntary negotiation process is the Commonwealth's only realistic pathway forward.  With the added benefit and breathing room afforded by the Court's decision today, the defendants must not delay in pursuing it.

### III.   CONCLUSION

For the reasons outlined above, the Oversight Board's motion to intervene in these consolidated actions is **DENIED WITHOUT PREJUDICE.** (Civil No. 16-1610, Docket No. 137; Civil No. 16-2101, Docket No. 89; Civil No. 16-2257, Docket No. 65; Civil No. 2510, Docket No. 72.)   Plaintiffs' respective requests to vacate the PROMESA automatic stay pursuant to section 405(e) are also **DENIED.** (Civil No. 16-1610, Docket No. 71; Civil No. 16-2101, Docket No. 36; Civil No. 16-2257, Docket No. 11; Civil No. 16-2510, Docket No. 2.)   U.S. Bank may, however, proceed to disburse funds held in its reserve account to UPR bondholders pursuant to the terms of its trust agreement.   (Civil No. 16-2510, Docket No. 2.)

**IT IS SO ORDERED.**

San Juan, Puerto Rico, November 15, 2016.

<u>s/ Francisco A. Besosa</u>
FRANCISCO A. BESOSA
United States District Judge